R.W., SR. (Father) and D.B.W. (Mother), Appellants–Respondents,

v.

MARION COUNTY DEPARTMENT OF CHILD SERVICES, The State of Indiana Department of Child Services, and Child Advocates, Inc., Appellees–Petitioners.

No. 49A04–0801–JV–64.

Court of Appeals of Indiana.

Aug. 26, 2008.

240

Mark Small, Marion County Public Defender, Indianapolis, Steven J. Halbert, Carmel, IN, Attorneys for Appellants.

James E. Moore, Marion County Department of Child Services, Indianapolis, Rebecca A. James, Dubois County Department of Child Services, Jasper, IN, Attorneys for Appellees.

**OPINION**

FRIEDLANDER, Judge.

Diane B–W. (Mother) and Richard W. (Father) appeal the termination of their parental rights in Marion Superior Court, Juvenile Division, to their respective biological children. They present the following restated issues on appeal:

1. Did the juvenile court commit reversible error when the presiding magistrate failed to sign the final order terminating Mother's and Father's parental rights?

2. Did the Marion County Department of Child Services (MCDCS) fail to prove by clear and convincing evidence the statutory elements required for termination of Mother's and Father's parental rights?

We affirm.

Mother is the biological mother of D.B., born on February 1, 1994, and R.W., Jr., born on November 17, 2000. Father is the biological Father of R.W., Jr., but not of D.B. The facts most favorable to the judgment reveal that on or about April 24, 2004, Mother and Father were married and living together, with all their children and two additional unidentified males, when police officers observed then three-year-old R.W., Jr. wandering around the alley behind the family home, naked and unsupervised. The officers contacted the MCDCS for assistance. Family case manager LeVelle Harris arrived at the home and initiated an investigation. Upon questioning the parents, Harris learned that Mother and Father were unaware that R.W., Jr. had gone outside. The parents indicated that, unbeknownst to Mother, Father had left the house while she was sleeping. Additionally, Mother's two daughters, ten-year-old D.B. and eleven-year-old A.T.[1], who also resided at the

---

1. A.T. was eventually dismissed from the underlying cause so that her plan for permanen-

home, were both absent. The parents informed Harris that the girls were staying with friends, but neither could provide Harris with the friends' names or addresses.

While at the family residence, Harris observed numerous safety hazards. There were broken windows in the residence and broken glass strewn about the lawn and walkways. There were broken CD cases and plastic shards scattered on the floors, as well as several electrical cords running through the walkways of the home. Based on these facts, R.W. was taken into protective custody. A.T. and D.B. were located at school on or about the following day and also taken into protective custody.

On April 27, 2004, the MCDCS filed a petition alleging the children were in need of services (CHINS) because the parents had "failed to provide them with a safe environment and appropriate level of supervision." *Petitioner's Exhibit* 1. On the same day, both parents signed an Agreed Entry admitting the children were CHINS and agreeing to participate in various services designed to achieve reunification with the children. Pursuant to the Agreed Entry, the parents were obligated to, among other things: (1) participate in a parenting assessment and follow all resulting recommendations; (2) complete a drug and alcohol assessment[2] and follow all recommended treatment plans; (3) secure and maintain a legal source of income, (4) maintain suitable, clean, and safe housing; and (5) exercise regular visitation with the children consistent with the court's order.

Mother and Father initially complied with court-ordered services. Mother completed a parenting assessment and, as a result, was referred for a psychiatric ex-

amination, which she completed. Mother also completed recommended parenting classes and began home-based counseling. Father, too, completed a parenting assessment and began home-based counseling.

The parents' compliance began to wane, however, after the commencement of home-based services. The first home-based referral was made in February 2005. This service was terminated three months later by the MCDCS because the provider did not supply the MCDCS with timely reports, which was no fault of the parents. A second referral for home-based services was made in May 2005. In September 2005, however, this home-based counseling service was terminated at the request of service providers, because Mother and Father were having marital problems.

A third attempt at home-based counseling services was initiated in January 2006. Counselor Jan Lewis met with the parents regularly, spending approximately 151 hours working with the parents towards reunification with the children. At the outset, Lewis helped Mother and Father identify the needs of the family and develop goals for providing the family with stability and safety. For the duration of her involvement, Lewis tried to assist Mother and Father in accomplishing these goals by helping them obtain employment, food stamps, and housing. Lewis also assisted the parents with transportation and monitored their utilities so that they could get help, for example, if they fell behind with their electric or phone bills. Lewis provided Mother and Father with lists of food pantries and their hours of operation. Lewis also attempted to counsel Mother and Father on how to problem-solve and communicate more effectively with one an-

---

cy could be changed from termination and adoption to Another Planned Permanent Living Arrangement.

2. Father was not required to submit to a drug and alcohol assessment.

other, as well as on parenting techniques, such as how to set limits and be more engaged with the children. Additionally, Lewis attempted to assist Mother, who has a severe hearing impairment, in addressing her disability. Lewis recommended sign language classes and tried to help Mother obtain special hearing aids for her specific type of hearing loss.

Despite more than a year of home-based services, conditions in the home did not improve. Additionally, Mother and Father continued to struggle with their ability to communicate and problem solve, in part, due to Mother's inability to hear.[3] Also during this time, Lewis observed D.B. direct inappropriate "flirtatious behavior" towards Father, who failed to stop it or set appropriate boundaries. As a result, the MCDCS recommended Father participate in a psychosexual evaluation. Father completed the evaluation in November 2006, but failed to participate in the resulting recommended treatment program. Lewis eventually closed the home-based counseling services as unsuccessful in February 2007.

The MCDCS filed a petition to involuntarily terminate Mother's and Father's parental rights to their respective children in February 2007.[4] A three-day, fact-finding hearing on the termination petition commenced on August 22, 2007, continued on October 1, 2007, and was later completed on October 15, 2007. Magistrate Danielle Gaughan presided over the fact-finding hearing. At the conclusion of the hearing, Magistrate Gaughan took the matter under advisement. On January 9, 2008, the

juvenile court issued its judgment terminating both Mother's and Father's parental rights. The judgment was signed only by Marion County Superior Court Judge Marilyn Moores. The following appeal ensued.

Mother and Father argue on appeal that the juvenile court's judgment terminating their parental rights is clearly erroneous. Specifically, Mother claims reversal is mandated because the termination order is technically deficient, in that the magistrate who presided over the termination hearing failed to sign the final termination order. Additionally, both Mother and Father assert the MCDCS failed to prove by clear and convincing evidence all the statutory elements of I.C. § 31–35–2–4(b)(2), as is required for the involuntary termination of parental rights. Specifically, Mother claims the MCDCS failed to prove that the conditions resulting in the children's removal would not be remedied and instead wrongfully terminated her parental rights because of her hearing impairment. Father also asserts the MCDCS failed to prove that the conditions leading to R.W., Jr.'s removal from his care would not be remedied. Mother and Father each argue the MCDCS failed to prove that continuation of the parent-child relationship poses a threat to their respective children's well-being. Finally, Father asserts that the MCDCS failed to prove by clear and convincing evidence that termination of the parent-child relationship between him and R.W., Jr. was in R.W., Jr.'s best interests.

1.

■ We first address Mother's assertion that reversal is mandated because the

---

3. Mother failed to maintain health coverage and keep appointments necessary to obtain the appropriate hearing aids. Mother also refused to learn sign language. Visitation between the parents and the children remained "very chaotic" and Lewis was never able to recommend unsupervised visitation. *Transcript* at 99.

4. A previous petition for involuntary termination of parental rights had been filed and denied in November 2006. The children, however, were not returned to their parents at that time.

final order terminating Mother's and Father's parental rights to D.B. and R.W., Jr. is not signed by the magistrate who presided over the termination hearing. Mother directs our attention to I.C. § 33-23-5-9, which states, in pertinent part, "[A] magistrate shall report findings in an evidentiary hearing, a trial, or a jury's verdict to the court. The court shall enter the final order." The record reveals that the juvenile court entered a final order terminating Mother's and Father's parental rights. The termination order contained specific findings and conclusions and was signed and dated by Marion County Superior Court Judge Marilyn Moores. Mother insists, however, that the juvenile court's order is deficient because it does not bear the signature of Magistrate Gaughan, who presided over the evidentiary hearing. Mother argues that without Magistrate Gaughan's signature on the final termination order, the record "does not contain any oral or written findings of Magistrate Gaughan[,] so there is nothing on which to base a termination order." *Appellant–Mother's Brief* at 9.

There is no "show your work" requirement contained in I.C. § 33-23-5-9. The clear and unambiguous language of this statute simply requires a magistrate to report his or her findings, following an evidentiary hearing, to the trial court. It does not prescribe a specific method for doing so. The trial court is thereafter required to enter a final order, which, in this case, it did. Mother does not provide us with any proof that Magistrate Gaughan failed to report her findings to Judge Moores. Moreover, a thorough review of the record clearly establishes that Judge Moores's final order reflects the evidence presented during the termination hearing. Although having both Judge Moores's and Magistrate Gaughan's signatures on the final order may be preferable, it certainly is not statutorily required. Accordingly, we find no error.

2.

Next, we address Mother's and Father's contentions that the MCDCS failed to prove by clear and convincing evidence the statutory elements required for the termination of parental rights.

This court has long applied a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832 (Ind.Ct.App.2001). When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258 (Ind.Ct.App.2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the juvenile court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204 (Ind.Ct.App.1999), *trans. denied.* If the evidence and inferences support the juvenile court's decision, we must affirm. *Id.*

Here, the juvenile court made specific findings and conclusions thereon in its order terminating Mother's and Father's parental rights. Where the court enters specific findings and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake County Office of Family & Children,* 839 N.E.2d 143 (Ind.2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen,* 671 N.E.2d 98, 102 (Ind.1996). A judgment is clearly erroneous only if the findings do not sup-

port the trial court's conclusions or the conclusions do not support the judgment thereon. *Quillen v. Quillen,* 671 N.E.2d 98.

■■■ As indicated previously, the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind.Ct.App.1996), *trans. denied.* The juvenile court, however, must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.,* 750 N.E.2d 832. Parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities. *Id.*

In order to terminate a parent-child relationship, the State is required to allege that:

(A) one (1) of the following exists:

   (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;

           \* \* \*

(B) there is a reasonable probability that:

   (i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or

   (ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

I.C. § 31–35–2–4(b)(2). The State must establish each of these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare,* 592 N.E.2d 1232 (Ind.1992). Mother and Father do not contest the fact that the children had been removed from their care, pursuant to a dispositional decree, for at least six months. They each assert, however, that the MCDCS failed to establish various parts of the remaining elements contained in I.C. § 31–35–2–4(b)(2).

Mother and Father argue on appeal that the MCDCS failed to prove by clear and convincing evidence both that the conditions resulting in the children's removal would not be remedied, and that continuation of the parent-child relationship poses a threat to the children's well-being. Mother specifically asserts that "the concerns of the [MCDCS] at the time of removal are no longer an issue." *Appellant–Mother's Brief* at 9. Mother further asserts there is "no evidence [her] current living situation [is] dangerous, unsafe or a threat to her children" and claims that the "caseworkers pushed for termination only because [her] disability made her less than an ideal parent." *Id.* at 6, 9. Father argues there is "no indication that the alleged failure to supervise [is] likely to reoccur" because both parents completed parenting classes. *Appellant–Father's Brief* at 10. Father also notes that, at the time of the termination hearing, the home-based counselor described Mother and Father's home as "generally orderly" and stated there were no longer any "dangers in terms of the physical aspects of the home." *Id.* at 12.

We pause to note that I.C. § 31–35–2–4(b)(2)(B) is written in the disjunctive. Thus, a trial court need only find by clear and convincing evidence that one of the two requirements of subsection (B) have been met in order to terminate a parent-child relationship. *See In re L.S.,* 717 N.E.2d at 209. Here, the juvenile court found that both requirements of subsection (B) were met. That is to say, the juvenile

court determined, based on the evidence, both that there was a reasonable probability the conditions resulting in the children's removal and continued placement outside Mother's and Father's care would not be remedied and that continuation of the parent-child relationships pose a threat to the children's well-being. We will first consider whether clear and convincing evidence supports the juvenile court's determination that a reasonable probability exists that the conditions resulting in the children's removal or continued placement outside the family home will not be remedied.

▆▆▆ When determining whether a reasonable probability exists that the conditions justifying a child's removal and continued placement outside the home will not be remedied, the juvenile court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509 (Ind.Ct.App.2001), *trans. denied.* The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children. *In re M.M.*, 733 N.E.2d 6 (Ind.Ct.App.2000).

In terminating Mother's and Father's parental rights to the children, the juvenile court made the following pertinent findings:

8. Both [Mother] and [Father] admitted to the allegations in the CHINS petition on April 27, 2004, and the court proceeded to disposition on that date, removing the children from their care and custody. Both parents agreed to complete all court[-]ordered services to reunify their family.

9. [Mother] and [Father] completed a parenting assessment in June 2004. That assessment recommended further services, including a psychological evaluation for [Mother] and home [-]based counseling for both parents.

\* \* \*

11. The third and most recent referral to home[-]based counseling was in January 2006. The parents worked with the home[-]based counselor, Jan Lewis, and set goals for reunification of their family. Among the issues to be addressed was assisting the parents in providing a safe and stable home, developing appropriate parenting practices[,] and improving communication between parents.

12. Jan Lewis also wished to address [Mother's] hearing loss so that she could effectively engage in meaningful communication with her children and others. [Mother] has an unusual type of hearing loss that would be difficult to correct with hearing aides [sic], however, she was encouraged to have repeated adjustments to her hearing aides [sic] to achieve maximum benefit. [Mother] has not followed through with these appointments and continued to have difficulty hearing and communicating with others.

13. [Mother] does not wish to learn sign language and will not consider any other available methods of communication. She was unable to achieve the goals of home [-]based counseling because she could not effectively communicate with her children or her husband.

14. While Jan Lewis was providing home[-]based counseling services to this family, she observed a lack of appropriate boundaries between [D.B.] and [Father]. [D.B.]

seemed to be overly flirtatious with her father. Ms. Lewis recommended that [Father] complete a [psychosexual] evaluation to determine if there were other issues that needed to be addressed for the safety of the children.

15. [Father] completed the psychosexual evaluation in November of 2006 but failed to engage in the treatment program recommended by the evaluator. [Father] admitted to the evaluator, Dr. Stephen Harrison, that he sang sexually explicit songs to his step [-]daughters in front of the home[-]based counselor.

\* \* \*

18. At the time of trial, [Father], though aware of the recommendation of Dr. Harrison, and himself having requested the referral for therapy for his sexual compulsivity, failed to attend treatment on a regular basis. Of the four weekly sessions scheduled prior to trial, [Father] attended the first two sessions but failed to attend the second two sessions.

19. Jan Lewis, the home[-]based counselor, never recommended that this family progress to unsupervised visits because of [Mother's] failure to address her communication difficulties and [Father's] failure to engage in psychosexual therapy. Supervised visits that Ms. Lewis observed were chaotic and the parents were not sufficiently aware of the children in order to keep them safe. In December of 2006, during a supervised visit in the mall, [Mother] was with the girls and seemed unaware [of] where [R.W., Jr.] was. [A.T.]

got angry and left the family group and [Mother] was not sure where she went and unsure how to handle the situation. During supervised visits in the home, both parents seemed disengaged from their children. [Mother] has difficulty communicating with them because of her hearing impairment and [Father] would often go upstairs and sleep.

20. The third home[-]based referral service was closed in February 2007 because the parents were not progressing. Jan Lewis never felt that she could recommend unsupervised visits for the family because of her safety concerns.

21. At the time of trial, the living arrangements for the parents were unsettled at best. [Mother] and [Father] indicated that they were living in the home of a fellow member of their church. [Mother] also stated that she wanted her own place separate from her husband.

22. There is a reasonable probability that the conditions that resulted in the children's removal from [and] continued placement outside the care and custody of [Mother] and [Father] will not be remedied. [D.B.] and [R.W., Jr.] have been out of the home for over three years. During that time, both parents have been unable to follow through, complete home-based counseling, and advance to unsupervised visitation. At the time the children were taken from the home, [Mother] and [Father] were unable to provide a safe environment for their children with adequate supervision. These parents are still unable to provide a safe environment for their children with adequate supervision in spite of over three

years to complete services referred by [MCDCS]. [Mother] ... is unable to engage with her children enough to keep them safe because of her failure to address her hearing impairment. [Father] has failed to consistently engage in psychosexual therapy. Though efforts have been made at services, both parents have failed to follow through and complete services and therefore [the] safety of [D.B.] and [R.W., Jr.] is still at risk.

*Appellant–Father's Appendix* at 15–18. The evidence most favorable to the judgment supports these findings, which in turn support the juvenile court's conclusion that "[t]here is a reasonable probability that the conditions that resulted in the children's removal from [and] continued placement outside the care and custody of [Mother] and [Father] will not be remedied." *Id.* at 19.

Mother and Father initially participated in and successfully completed several of the court-ordered services, including parenting assessments, parenting classes for Mother, and a psychosexual assessment for Father. The record reveals, however, that at the time of the termination hearing, approximately three years had passed since the children were removed from the family home, yet Mother and Father still had not completed court-ordered services and there was no significant overall improvement of the conditions leading to removal. Specifically, Lewis had to unsuccessfully discharge the parents from home-based counseling after over a year of services and approximately 151 hours of personal interaction with the parents because of their failure to follow through with case goals and failure to progress in services. When questioned during the termination hearing as to why she terminated home-based services, Lewis responded, "I felt the family had reached the maximum benefit of services. They were not able to follow through on the tasks that needed to be done." *Transcript* at 103. With regard to visitation and safety of the children, Lewis testified, "Our concerns were that we weren't able to move forward with unsupervised visitation until we were sure that there was no risk for the children and[,] as a result[,] throughout the life of the case the visits remained at four hours supervised." *Id.* at 99. Lewis went on to say that there were times when even "the supervision didn't ensure safety." *Id.*

In addition to not being able to appropriately supervise the children, failing to complete home-based services, and failing to improve their ability to effectively communicate with each other, the record reveals that at the time of the termination hearing, the parents had also not achieved the dispositional goal of securing and maintaining a safe and stable home. Although the record reveals that the condition of the home the parents were living in at the time of the termination hearing was generally orderly, this does not mean Mother and Father had established safe and stable housing. Rather, they were living with a mutual friend from church at the time. Moreover, this arrangement appears to be temporary in that Mother testified she planned to find a home of her own, separate from Father.

A juvenile court may properly consider the services offered by the Department of Child Services, and the parent's response to those services, as evidence of whether conditions will be remedied. *A.F. v. Marion County Office of Family & Children,* 762 N.E.2d 1244 (Ind.Ct.App.2002), *trans. denied.* "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a find-

ing that there exists no reasonable probability that the conditions will change." *Lang v. Starke County Office of Family & Children,* 861 N.E.2d 366, 372 (Ind.Ct. App.2007), *trans. denied.* Moreover, where there are only temporary improvements, and the pattern of conduct shows no overall progress, the court might reasonably infer that under the circumstances, the problematic situation will not improve. *In re A.H.,* 832 N.E.2d 563 (Ind.Ct.App.2005).

Based on the foregoing, we find that the juvenile court's determination that the reasons for the children's continued placement outside of Mother's and Father's care would not be remedied is supported by clear and convincing evidence and thus is not clearly erroneous.[5] Additionally, a thorough review of the record reveals that the juvenile court did not in any way base its decision to terminate Mother's parental rights upon the mere fact that Mother has a hearing disability. Rather, the court properly considered Mother's refusal to take readily available steps to bridge the communication gap caused thereby—a communication gap that seriously hindered Mother's ability to effectively care for her children. *Cf. In re R.G. v. Marion County Office, Dep't of Family & Children,* 647 N.E.2d 326 (Ind.Ct.App.1995) (determining that a juvenile court may properly consider the parents' mental disability where that disability renders the parents incapable of fulfilling their legal obligations in caring for their child; this is true not only where the child is in immediate danger of losing his or her life, but also where the child's emotional and physical development is threatened thereby), *trans. denied.*

Next, we address Father's assertion that the juvenile court erred when it found termination of his parental rights is in R.W., Jr.'s best interests. In determining what is in the best interests of a child, the court is required to look beyond the factors identified by the Department of Child Services and look to the totality of the evidence. *McBride v. Monroe County Office of Family & Children,* 798 N.E.2d 185 (Ind.Ct.App.2003). The purpose of terminating parental rights is not to punish the parents but to protect the children involved. *In re K.S.,* 750 N.E.2d 832. The juvenile court must therefore subordinate the interests of the parents to those of the children when determining the best interests of the children. *McBride v. Monroe County Office of Family & Children,* 798 N.E.2d 185. The juvenile court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.*

In addition to the findings set forth previously, the juvenile court made the following additional pertinent finding in determining that termination of Father's parental rights is in R.W., Jr.'s best interests:

24. Termination of the parent-child relationship between [R.W., Jr.] and . . . [Father] is in the best interests of [R.W., Jr.]. [R.W., Jr.] is currently placed in the home of his maternal cousin where he has been placed for the past three years. He has no special needs. Two other children, one his age and one who is ten, are also in the home. [R.W., Jr.] has integrated with this family and this home is what he has

---

5. Having determined that the juvenile court's conclusions regarding the remedy of conditions is not clearly erroneous, we need not address whether the MCDCS proved by clear and convincing evidence that the continuation of the parent-child relationships between Mother, Father, and their respective children poses a threat to the children's well-being. *See In re L.S.,* 717 N.E.2d 204.

known most of his life. His caregiver intends to adopt him.

*Appellant–Father's Appendix* at 18. The record reveals that this finding is supported by testimony from Lewis, as well as the Guardian ad Litem (GAL) and current MCDCS case manager.

Lewis testified that at the time she discontinued home-based services, she felt Mother and Father could not safely parent the children in their home. Lewis further acknowledged that the family was not "bonded." *Transcript* at 120. GAL Linda Kaser testified she had observed R.W., Jr. in placement and that he is "a happy little guy" who was "absolutely" integrated into his foster home. *Id.* at 192–93. In recommending termination of Father's parental rights to R.W., Jr., Kaser further stated:

> He is six years old. He has been out of the care of his parents for over three years. That is more than half of his lifetime. He is happy. He is well-adjusted. He is with the only family that he has truly ever known. And we should not take that away from a child.

*Id.* at 200. When asked whether the parents should be given more time to complete services, Kaser responded, "No.... [The][p]arents have had what I believe is plenty of time, given the number of years the children have been in the system." *Id.* at 203. Similarly, MCDCS family case manager Mary Engle also testified that she felt termination and adoption was in R.W., Jr.'s best interests. Engle expressed the following "concerns" regarding reunification of Mother and Father with the children: "There is not (sic) stable housing. There is a recent issue of some domestic violence between [Father] and [Mother]. Parenting abilities (sic) and [Father] has not completed his treatment at Broad Ripple Counseling." *Id.* at 152. Engle testified that R.W., Jr. is "very bonded and attached" with his pre-adoptive relative foster parent and "feels like he is part of that family[.]" *Id.* at 154.

Our review of the record convinces us that although Father may have a sincere desire to be reunited with his son, the testimony set forth above, coupled with the evidence of Father's failure to complete court-ordered services, and the fact that R.W., Jr. is happy, bonded with, and doing well in his pre-adoptive foster home, is sufficient to support the juvenile court's determination that termination of Father's parental rights is in R.W., Jr.'s best interests. *See In re A.I.*, 825 N.E.2d 798 (Ind. Ct.App.2005) (concluding that the testimony of the court-appointed special advocate and family case manager, coupled with evidence that the conditions resulting in placement outside the home will not be remedied, was sufficient to prove by clear and convincing evidence that termination was in child's best interest), *trans. denied.*

In sum, we conclude the final termination order was not technically flawed on the basis that it lacked the magistrate's signature. Additionally, the record reveals the MCDCS proved by clear and convincing evidence all the statutory elements required for the termination of Mother's and Father's parental rights to their respective biological children. The judgment terminating parental rights was not clearly erroneous, and therefore is affirmed. *See In re L.S.*, 717 N.E.2d 204.

Judgment affirmed.

DARDEN, J., and BARNES, J., concur.