# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 11 2016, 9:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven Knecht
Vonderheide & Knecht
Lafayette, Indiana

ATTORNEY FOR APPELLEE

James D. Boyer
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of:<br><br>K.K. & D.K. (Minor Children),<br><br>And<br><br>Ke.K. (Father),<br><br>*Appellant-Respondent,*<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner.* | August 11, 2016<br><br>Court of Appeals Case No. 79A05-1601-JT-166<br><br>Appeal from the Tippecanoe Superior Court<br><br>The Honorable Thomas K. Milligan, Judge<br><br>Trial Court Cause No. 79D03-1507-JT-54 & 79D03-1507-JT-55 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, K.J.K. (Father) appeals the termination of his parental rights to his minor children, K.K. and D.K. (collectively, Children).

We affirm.

## ISSUE

Father raises one issue on appeal, which we restate as follows: Whether the Indiana Department of Child Services (DCS) presented sufficient evidence to support the termination of Father's parental rights.

## FACTS AND PROCEDURAL HISTORY

Father and K.R. (Mother) are the biological parents of K.K., born on July 9, 2005, and D.K., born on April 5, 2007.[1] From the time the Children were born, Mother has had sole custody. Father, who lived in Chicago, Illinois, during the Children's early years, had very little involvement in the Children's lives. Although Father vaguely claimed that he spent time with the Children whenever Mother was in the Chicago area, he never provided any financial support to Mother for the Children's care. Father reported that, while living in Chicago, he "was practically homeless" and stayed with his mother. (Tr. p.

---

[1] Mother has four other children—one older and three younger than K.K. and D.K.—who were also involved in the child protective proceedings initiated by DCS. Although facts pertaining to their half-siblings are included where appropriate, this appeal solely concerns the Children. Additionally, Mother's parental rights to the Children were terminated on December 30, 2015. Mother is not a party to this appeal, but facts pertaining to Mother are also included where appropriate.

116). According to Father, in 2011, the Children lived with him for approximately a month and a half. However, between October of 2012 and October of 2013, he saw the Children no more than three times. At either the end of 2013 or early 2014, Father moved to Bloomington, McLean County, Illinois.

[5] At some point, Mother and her children moved to Lafayette, Tippecanoe County, Indiana, although it is unclear where Mother had been living previously. At the time, Father had no knowledge of the Children's whereabouts or welfare. Between September 26, 2013, and October 18, 2013, the Tippecanoe County DCS office received four reports of child neglect involving Mother and her six sons. In relevant part, the reports alleged that, in addition to truancy issues, the Children were behind in school, and Mother would frequently send them to school tardy, dirty, smelling of urine, and wearing the same clothing as the previous day. The reports described D.K.'s behavior as being out of control and violent, and he was accused of stealing an iPad from the school. On several occasions, D.K. urinated in his pants at school, and his soiled clothing remained in his backpack for several days. Due to uncleanliness, D.K. would "constantly scratch[]" at his "private area." (DCS Exh. 2, p. 2). D.K. often complained of being hungry, and he was at risk of expulsion because Mother had not obtained all of his necessary vaccinations. The report further alleged that Mother, who did not have a valid driver's license, was driving all six of her children and did not have the requisite number of car seats/booster seats in the vehicle. Finally, there were also general

concerns about Mother's lack of supervision of the children. DCS commenced an investigation.

[6] On October 3, 2013, DCS interviewed the Children at school. K.K. reported that he feels safe at home and that they have sufficient food. D.K., however, repeatedly indicated that he could not say anything about his Mother for fear of being punished with a belt. Later that day, Mother admitted to DCS that she had instructed her children not to share any information with DCS. On October 7, 2013, DCS learned that, while on a school field trip, D.K. had defecated on himself, and before emerging from the restroom naked, had smeared feces all over himself and the restroom. When he returned to school, he smeared feces on the school nurse. Around this time, D.K. also experienced other violent outbursts at school. A home visit on October 9, 2013, revealed that Mother's "home appeared to be clean, there were utilities on and working, [and] plenty of food." (DCS Exh. 2, p. 4).

[7] Despite DCS' involvement, the Children continued to have unexcused absences from school; K.K. was suspended from school for stealing a cell phone; and D.K. was suspended from school for misbehavior. On October 30, 2013, Mother was arrested for theft after she pawned iPads stolen from the school. With no one to care for the Children, DCS placed them, as well as their half-siblings, in foster care. On October 31, 2013, with the trial court's authorization, DCS filed a petition alleging the Children to be Children in Need of Services (CHINS).

[8] On November 8, 2013, after Mother posted bond and was released from incarceration, the Children were returned to her care. On November 15, 2013, the trial court ordered DCS to "make a minimum of three unannounced drop-ins per week in Mother's home to ensure the health and safety of the minor children." (DCS Exh. 1, p. 13). On November 18, 2013, the trial court assigned a court-appointed special advocate (CASA), and on December 26, 2013, the trial court adjudicated the Children to be CHINS.

[9] At the end of December 2013, with the trial court's permission, Mother and the Children relocated to Hammond, Lake County, Indiana, to temporarily live with the Children's maternal grandmother. However, on December 31, 2013, CASA and DCS conducted an unannounced visit and discovered that Mother was on the verge of losing her housing with the maternal grandmother, who had received an eviction notice. CASA and DCS also learned that Mother, without DCS' knowledge, had allowed the Children's paternal grandmother to take the Children to Illinois to stay with her. That day, DCS removed the Children from Mother's custody. Father informed DCS that he was not a viable option for the Children's placement because he lacked independent housing and the financial means to provide for them. The Children were placed in foster care in Tippecanoe County. Initially, all six children were placed together. However, because of D.K.'s severe behavioral problems, DCS had to separate him from his brothers in order to find a therapeutic foster home. In total, D.K. was placed in six different foster homes during the CHINS proceedings.

[10] On January 12, 2014, the trial court conducted a dispositional hearing and ordered that the Children be made wards of DCS, with continued placement in foster care. The same day, the trial court issued a Parental Participation Decree, which required that Father contact the DCS case manager monthly; establish paternity; complete the ICPC process[2]; and "[p]articipate in visitation services as agreed upon and arranged by the treatment team." (DCS Exh. 1, p. 27). The Parental Participation Decree also directed Father, in part, to obtain and maintain safe housing suitable for the Children, obtain and maintain a legal and stable source of income adequate to support his household, and to keep DCS apprised of his contact information. Following a hearing in January of 2014, Father had an in-person visit with the Children, which was the last time that Father saw the Children during the pendency of this case.

[11] By March of 2014, Father had established his paternity for the Children. Father reported to DCS that he had no transportation to make the four-hour drive for visits. Father also stated that he had obtained new employment and was temporarily living with a friend until his apartment was ready. Regarding the ICPC process, Father indicated that he wanted to wait until he was settled into his new apartment with his girlfriend and their children. Father further

---

[2] The Interstate Compact on the Placement of Children (ICPC) was enacted to facilitate cooperation between states for the interstate placement of children so that each child "shall receive the maximum opportunity to be placed in a suitable environment and with a person or an institution having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care." Ind. Code § 31-28-4-1 art. I(a). According to DCS, as part of the ICPC process, Illinois authorities would conduct a background check on Father; visit his home to ensure its suitability for the Children; and verify Father's employment and other issues of stability.

informed DCS "that he did not want [the Children] full time but that he would take [them] for either the school year or for the summer. During which [Mother] would have the [C]hildren the [opposite] time." (DCS Exh. 3, pp. 35-36). Given the distance between Father and the Children and Father's lack of transportation, DCS struggled to find a service provider to facilitate visitation.

[12] Between April and November of 2014, Father communicated with DCS on a regular basis, and he appeared for court proceedings either in person or by phone. However, Father refused to provide "a straight answer" to DCS' inquiries regarding his housing. (Tr. p. 30). Also, during this time, Father had regular telephone conversations with the Children once or twice per month. DCS attempted to arrange in-person visits, but Father indicated that he did not have the financial means to travel to Indiana. Although DCS offered to provide Father with gas cards or bus passes to visit the Children, Father would not establish a date that he was available for a visit. Instead, Father repeatedly promised the Children that he would visit soon but never did so. In addition, DCS contacted Father "more than once a month from [April of 2014] until about August or September 2014" to remind Father of and assist him with initiating the ICPC process. (Tr. pp. 23-24). During those conversations, Father would agree to provide the required background information, but when DCS "would ask him can you complete the information today over the phone or mail it to [DCS] by a certain date[,] he had an excuse of why he couldn't complete it." (Tr. p. 24). Finally, at some point in August or September of 2014, Father provided the necessary background information to initiate the

ICPC procedure. Accordingly, the Illinois authorities attempted to schedule a time to evaluate Father's home, but Father indicated that he did not have stable housing and would be unable to complete the ICPC process. Thereafter, Father never contacted the Illinois authorities to reinitiate the process.

[13] Between November of 2014 and March of 2015, Father did not maintain contact with DCS. Furthermore, even though Father did not participate in any visits with the Children, two visitation facilitators discontinued their services based on Father's refusal to communicate. Father also refused to answer the phone when his Children would call for their scheduled phone visits. DCS noted that Father's "lack of participation disappoints [the Children] and causes them to have further self esteem issues and behavior issues." (DCS Exh. 3, p. 95). On January 27, 2015, the trial court ordered Father's "[v]isitation suspended until such time as [he] appear[s] before the [c]ourt and [is] invested in services." (DCS Exh. 1, p. 70).

[14] On March 4, 2015, the trial court held a hearing and determined that Father could not resume visitation with the Children, but "[s]hould Father consistently contact the DCS Family Case Manager . . . each Monday morning at 9:00AM Lafayette time by telephone for a period of eight (8) weeks, [the] [c]ourt will reconsider reinstating telephone contact between [Father] and his [C]hildren." (DCS Exh. 1, p. 74). The trial court further directed DCS to "assist [Father] in investigating services available within his community." (DCS Exh. 1, p. 75). For the next four weeks, Father "did not call at his scheduled time. He would call several hours later or several days later and would put off the discussion

about housing or employment, make excuses." (Tr. p. 28). After DCS reminded Father of the need to participate, he called on time for the remaining four weeks. Father informed DCS that he knew of housing resources, so DCS compiled a list of job rehabilitation contacts and temporary employment agencies in his area. However, Father never completed the ICPC process; he never provided any documentation to DCS to establish that he had stable housing and income; he never indicated to DCS that he was prepared to meet the needs of the Children; and after a hearing in June of 2015, Father ceased communicating with DCS altogether.

[15] On July 17, 2015, DCS filed a petition to terminate the parents' parental rights to the Children. On October 2, 2015, the trial court conducted a termination hearing. During the hearing, Father asked the court not to terminate his parental rights because "there isn't nothing [*sic*] I wouldn't do for my kids." (Tr. p. 119). Father testified that he had secured full-time employment and was living in a two-bedroom apartment with his fiancée and their three children. However, both the DCS case worker and CASA recommended that Father's parental rights be terminated. On December 30, 2015, the trial court issued its Order to Terminate Parent-Child Relationship. In terminating Father's parental rights, the trial court concluded that there is a reasonable probability that the conditions that resulted in the Children's removal and continued placement outside the home will not be remedied; the continuation of the parent-child relationship poses a threat to the Children's well-being; and it is in the best interests of the Children that Father's rights be terminated.

[16]  Father now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

[17]  Father claims that DCS provided insufficient evidence to support the termination of his rights to the Children. When reviewing the termination of parental rights, our court does not reweigh evidence or assess the credibility of witnesses. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We will consider only the evidence and any reasonable inferences that are favorable to the trial court's judgment. *Id.*

[18]  In addition, the trial court issued specific findings of fact and conclusions thereon. Thus, we apply a two-tiered standard of review: first, we consider whether the evidence supports the findings; second, we determine whether the findings support the judgment. *Id.* Our court "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). We will reverse the trial court's judgment as being clearly erroneous "if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *Bester*, 839 N.E.2d at 147.

### II. *Termination of Parental Rights*

[19]  It is well established that "the parent-child relationship is 'one of the most valued relationships in our culture.'" *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1122 (Ind. Ct. App. 2013) (quoting *In re I.A.*, 934 N.E.2d 1127,

1132 (Ind. 2010)). Moreover, parents have a fundamental liberty interest in controlling the upbringing of their children without undue interference by the state. *Id.* Accordingly, the Fourteenth Amendment to the United States Constitution safeguards "the traditional right of parents to establish a home and raise their children." *Id.*

[20] Nevertheless, the rights of parents are not absolute; rather, parental interests "must be subordinated to a child's interests when considering a termination petition." *In re R.A.*, 19 N.E.3d 313, 318 (Ind. Ct. App. 2014) (citing *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1230 (Ind. 2013)), *trans. denied*. A child has "an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships." *Id.* (quoting *K.T.K.*, 989 N.E.2d at 1230). If a parent "is unable or unwilling to meet his or her parental responsibilities by failing to provide for the child's immediate and long-term needs," termination of the parent's rights is appropriate. *Id.* (citing *K.T.K.*, 989 N.E.2d at 1230). "The purpose of terminating parental rights is not to punish the parents but to protect the children involved." *R.W., Sr. v. Marion Cnty. Dep't of Child Servs.*, 892 N.E.2d 239, 249 (Ind. Ct. App. 2008). Because the termination of a parent's rights "is the most extreme sanction a court can impose" as it "severs all rights of a parent to his or her children," it is "intended as a last resort, available only when all other reasonable efforts have failed." *In re D.B.*, 942 N.E.2d 867, 872 (Ind. Ct. App. 2011).

In order to terminate a parent's rights to his or her child, DCS must prove, in relevant part,

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> * * * *
>
> (B) that one of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> * * * *
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

I.C. § 31-35-2-4(b)(2). DCS bears the burden of establishing each element by clear and convincing evidence. I.C. § 31-37-14-2. This heightened standard reflects the "serious social consequences" of terminating a parent's rights. *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d 1257, 1260-

61 & n.1 (Ind. 2009)). "Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *K.T.K.*, 989 N.E.2d at 1230 (quoting *Bester*, 839 N.E.2d at 148).

[22] On appeal, Father challenges the sufficiency of the evidence with respect to the second and third elements—that is, whether there is clear and convincing evidence of a reasonable probability that he would fail to remedy the conditions warranting the Children's removal and continued placement outside of his care *or* that the continuation of the parent-child relationship poses a threat to the Children's well-being, and whether there is clear and convincing evidence that terminating the parent-child relationship is in the Children's best interests. We will address each argument in turn.

## A. *Remedying Conditions*

[23] Father first challenges the trial court's conclusion that there is a reasonable probability that the conditions resulting in the Children's removal and continued placement outside the home will not be remedied. For this element, we engage in a two-step analysis. First, we must consider what conditions led to the Children's removal and continued placement in foster care; second, we must "determine whether there is a reasonable probability that those conditions will not be remedied." *Id.* at 1231 (quoting *In re I.A.*, 934 N.E.2d at 1134).

[24] In this case, as the trial court found, the Children were removed from Mother's care "due to the [C]hildren's poor hygiene and out of control behaviors, lack of immunizations, truancy, Mother's lack of involvement in the [C]hildren's education, and financial instability." (Appellant's App. p. 24). The record further reveals that on October 30, 2015, Mother was arrested for theft, leaving no suitable caregiver for the Children. Thus, Father argues that "[t]he [C]hildren were removed, not because of anything Father did or did not do, but as a result of Mother's neglect." (Appellant's Br. p. 13). In fact, Father contends that "DCS has no information regarding [his] ability to care for his [C]hildren, as they have not been in his custody since the CHINS proceeding began[,] [and] Father testified that he took good care of [the Children] when he had visitations with them prior to DCS involvement." (Appellant's Br. p. 13). We disagree. The trial court specifically found that Father has "been largely absent from the lives of the [C]hildren"—a finding which Father does not contest. (Appellant's App. p. 26). The Children were removed from their home and placed in foster care because, following Mother's arrest, the Children did not have any one available to care for them. At the time, Father informed DCS that the Children could not be placed with him because he did not have stable housing or the financial means to support them. Moreover, the Children *continued* to live in foster care throughout the CHINS proceedings due to, in part, Father's persistent lack of stability and involvement in the Children's lives. Therefore, the reasons for the Children's removal and placement in foster care were attributable to Father, and it was incumbent upon him to remedy those conditions.

[25]     Having identified the bases for the Children's removal and placement in foster care, we now must consider whether sufficient evidence supports the trial court's determination that there is a reasonable probability that Father will not remedy these conditions. In considering this issue, the trial court "must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration evidence of changed conditions." *R.W., Sr.*, 892 N.E.2d at 246. The trial court must also "consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *K.T.K.*, 989 N.E.2d at 1231 (quoting *Bester*, 839 N.E.2d at 152). The trial court has discretion to discredit any remedial efforts made shortly before the termination hearing. *Id.* at 1234.

[26]     The trial court found:

> [Father] is the father of [K.K.] and [D.K.] and he currently resides in Illinois. In order to ascertain his employment, housing, and current circumstances[,] DCS made efforts to initiate an ICPC. [Father] refused to participate with the Illinois Department and did not provide the necessary information required to complete the ICPC. The last reports provided by DCS regarding [Father] were dated August/September 2014 and at that time [Father] reported that he did not have independent housing and was struggling with financial instabilities. [Father] failed to provide straight answers to [DCS], did not provide proof of residency or employment. He reported chronic financial issues as reasons for his inability to visit his [C]hildren or work toward having them placed in his care.
>
> DCS offered gas cards and bus passes to assist [Father] with transportation to see the [C]hildren and/or participate in services. [Father] continued to offer excuses for his inability to

arrange transportation to Indiana. [Father] made no effort and appeared to have little interest or motivation to improve his circumstances so the [C]hildren could be placed in his care.

DCS noted at one time [Father] was employed and earning $9.25 an hour. He resided in a two (2) bedroom apartment with three (3) children and his longtime girlfriend who also worked full time and earned $10.50 an hour. It appears from that information that [Father] did have financial ability to travel to Indiana for visitation. Enough is still not known about [Father's] situation to know if he can care for the [C]hildren. When requested to do so [Father] makes excuses, doesn't want to commit, and fails to follow through.

(Appellant's App. p. 26).

[27] On appeal, Father does not specifically challenge any of the trial court's findings. Rather, he continues to make excuses for his lack of involvement and proffers arguments that amount to nothing more than requests that we reweigh evidence, which we will not do. Although he concedes that he did not complete the ICPC process, Father asserts that DCS could have conducted a background check rather than relying on the Illinois authorities to perform this duty, and he faults DCS for not offering him any services. Father also posits that his lack of involvement in the case was purely due to his "limited financial resources," which does not demonstrate his parental unfitness. (Appellant's Br. p. 14).

[28] A trial court "may properly consider the services offered by [DCS], and the parent's response to those services, as evidence of whether conditions will be remedied. 'A pattern of unwillingness to deal with parenting problems and to

cooperate with those providing social services, in conjunction with unchanged conditions support a finding that there exists no reasonable probability that the conditions will change.'" *R.W., Sr.*, 892 N.E.2d at 248-49 (internal citation omitted). Additionally, "where there are only temporary improvements, and the pattern of conduct shows no overall progress, the court might reasonably infer that under the circumstances, the problematic situation will not improve." *Id.* at 249.

[29] In the present case, the record establishes that Father was ordered to complete the ICPC process, and there is no dispute that he failed to do this. For five months, DCS attempted to assist Father with the completion of his background information in order to initiate the ICPC process. Even after Father informed the Illinois authorities that he could not complete the process based on his lack of stable housing, DCS endeavored to help Father reunite with his Children by providing information on employment resources and facilitating telephone visits. DCS arranged for service providers to facilitate visitation, but both providers terminated Father's services based on his lack of communication. Despite DCS' offers to provide bus passes and gas cards to Father, as well as offering to meet Father at a halfway point, in order for him to visit the Children, Father refused to even set a date for a visit. Instead, he ceased all communication with the Children in November of 2014 and last communicated with DCS four months prior to the termination hearing, and he now scoffs at DCS' offers of assistance by claiming that a gas card would have been useless in light of the fact that he does not own a vehicle.

[30] We are unpersuaded by Father's attempts to shift the blame to DCS for not doing enough to coerce his participation in the lives of his Children. It was incumbent upon Father to take responsibility as a parent and to have the motivation to put forth every effort necessary to achieve stability for the sake of the Children. *See In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000) ("[T]he law concerning termination of parental rights does not require [DCS] to offer services to the parent to correct the deficiencies in childcare."). Our courts have long held that "a parent may not sit idly by without asserting a need or desire for services and then successfully argue that he was denied services to assist him with his parenting." *Id.* Here, Father sought no services from DCS. In fact, he wholly failed to avail himself of the assistance that DCS did offer. By refusing to follow the court's orders (*i.e.*, maintaining contact with DCS, engaging in consistent telephone visits with the Children, and completing the ICPC), Father demonstrated his lack of commitment to the Children. *See id.* (noting that a parent's failure to appear for services and to participate in the court proceedings "reflects ambivalence").

[31] We further note that Father has never provided any type of financial support for the Children. Prior to the CHINS proceedings, he was admittedly homeless and had very little involvement with the Children. Throughout the current proceedings, Father informed DCS and the Illinois authorities that he lacked stable housing, and his employment has been "sporadic." (Tr. p. 55). At the termination hearing, Father testified that he was living in a two-bedroom apartment with his fiancée and three children and that he was working full-

time. However, even if Father acquired stable housing in early 2015 as he claimed, he never contacted DCS or the Illinois authorities to reinitiate the ICPC process.[3] Furthermore, DCS was never able to confirm Father's housing or employment situations due to Father's refusal to communicate with DCS. Thus, there is no evidence that Father's two-bedroom apartment, which is already occupied by five people, is appropriate for two more Children. Nor is there evidence, considering his historical inability to maintain stable housing, that Father will sustain a suitable living environment for the Children.

[32] As to Father's lack of financial resources, we agree that poverty "itself does not show unfitness." *In re B.D.J.*, 728 N.E.2d at 202-03. However, poverty cannot "excuse the total lack of an attempt to remedy the situation to meet even the most minimal of standards of acceptable child care." *Id.* at 203. Here, for a period of two years, Father refused to even engage in minimal efforts to be reunited with his Children. Father's lack of financial resources did not prevent him from calling and/or writing letters to the Children or maintaining contact with DCS. As the trial court aptly noted, Father testified at the termination hearing that he was working full-time and maintaining an apartment in which he helped support three other children. Thus, it is clear that at some point during the two years that the Children were in foster care, Father had the means to make a four-hour trip to visit with his Children and chose not to do so. The

---

[3] DCS testified that it was only aware that Father had obtained housing based on the fact that its notices to Father at the address he provided were not being returned in the mail.

Children have very specific and demanding needs, and Father has never demonstrated any interest in understanding those needs or establishing his ability to provide the necessary level of care. Therefore, we find that there is sufficient evidence to support the trial court's conclusion that there is a reasonable probability that Father will not remedy the conditions that resulted in the Children's removal and continued placement outside the home.[4]

## B. *Best Interests of the Children*

[33] Father next claims that there is insufficient evidence to support the trial court's conclusion that termination of his parental rights is in the best interests of the Children. In assessing a child's best interests, the trial court should consider the totality of the circumstances. *In re A.P.*, 981 N.E.2d 75, 82 (Ind. Ct. App. 2012). Among these factors, "[p]ermanency is a central consideration." *K.T.K.*, 989 N.E.2d at 1235 (alteration in original). The consideration of a child's best interests "necessarily places [his or her] interest in preserving the family into conflict with [his or her] need for permanency." *In re E.M.*, 4 N.E.3d at 647. Nonetheless, a trial court is not obligated to wait until a "child is irreversibly harmed such that the child's physical, mental and social

---

[4] Because we conclude that there is sufficient evidence to support the trial court's determination that there is a reasonable probability that the conditions resulting in the Children's removal and continued placement outside of Father's care will not be remedied, we need not address whether the continuation of the parent-child relationship poses a threat to the Children's well-being. *See K.T.K.*, 989 N.E.2d at 1231 (noting that Indiana Code section 31-35-2-4(b)(2)(B) only requires finding one or the other).

development is permanently impaired before terminating the parent-child relationship." *K.T.K.*, 989 N.E.2d at 1235.

[34]   In the present case, the trial court found that termination of parental rights is in the Children's best interest based, in part, on "the continued lack of [Father's] involvement and support in the lives of the [C]hildren. The [C]hildren have been removed from the home for nearly two (2) years and have spent the bulk of their lives in foster care. The [C]hildren need permanent stability and are adoptable." (Appellant's App. pp. 26-27). The trial court also found:

> [D.K.] is eight (8) years old and has been diagnosed with ODD and ADHD. He is prescribed medications to address related behaviors. [D.K.] is just now completing potty training, he has a severe lack of social interaction and would often bite, kick, and punch both children and adults. He would destroy property and run away from school. [D.K.] has an [individualized education plan (IEP)] due to severe emotional issues and since his placement in foster care his behaviors have improved as his emotional and medical needs are currently being met. [D.K.] continues to and may, long term, require behavior management services.

> [K.K. is ten years old and] also has an IEP due to a learning disability. Education continues to be . . . his biggest struggle due [to] lack of parental involvement and excessive truancy issues in the past. [K.K.] requires repetitive attention at school and in the home. [K.K.] is also engaged in counseling services that ha[ve] assisted in managing his behaviors. He has adapted well to his foster family and they appear to be able to meet his educational, emotional, and physical needs.

(Appellant's App. p. 26). Accordingly, the record reveals that the Children have special needs and require a dedicated caregiver who is motivated to help them thrive. For these reasons, both DCS and CASA testified that termination of Father's parental rights would serve the Children's best interests.

[35] Father now claims that the evidence does not support termination because he "shares a bond with his [C]hildren," and he wants to care for both of the Children and to keep them together. (Appellant's Br. p. 18). Other than the fact that Father interacted positively with the Children during phone visitations, there is no evidence that the Children are bonded to Father or that he is capable of caring for them. Rather, the evidence demonstrates that Father made "no commitment to taking any action and both of these [C]hildren need someone who can commit to taking action to meet their needs." (Tr. p. 39). Here, both DCS and CASA recommended terminating Father's parental rights based on his continuing lack of involvement and inability to meet the Children's needs. It was within the trial court's discretion to give credence to these professional opinions regarding the Children's best interests. *See In re A.P.*, 981 N.E.2d at 85. Therefore, we find sufficient evidence supports the trial court's determination that termination is in the best interests of the Children.

## CONCLUSION

[36] Based on the foregoing, we conclude that the trial court did not commit clear error as DCS presented clear and convincing evidence to support the termination of Father's parental rights to the Children.

Affirmed.

Bailey, J. and Barnes, J. concur