**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**DEIDRE L. MONROE**
Gary, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

FILED

May 22 2014, 10:40 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) ) ) | |
| E.M.D., E.D., and S.D., (Minor Children), | ) ) | |
| And | ) ) | |
| S.D., (Father), | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 45A03-1310-JT-394 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Thomas Webber, Sr., Judge
Cause Nos. 45D06-1303-JT-60, -61, & -62

**May 22, 2014**

**ROBB, Judge**

Case Summary and Issue

S.D. ("Father") appeals the trial court's involuntary termination of his parental rights to his daughters, Em. and El., twins born in August of 2003, and his son S., born in May of 2008. Father raises three issues for our review, which we consolidate and restate as one: whether there was sufficient evidence to prove the statutory elements required to termination of Father's parental rights.[1] Concluding the trial court's judgment terminating Father's rights was not clearly erroneous, we affirm.

Facts and Procedural History

In November 2011, Father and the children lived with Father's girlfriend, B., and her son.[2] On November 16, 2011, El. reported to a school aide and later to her teacher and the school counselor that Father had been touching her, her siblings, and B.'s son inappropriately. Representatives of the Indiana Department of Child Services, Lake County Office ("DCS") went to El.'s and Em.'s schools to interview them.[3] El. repeated

---

[1] In his statement of the issues, Father also alleged "DCS never afforded [him] the opportunity of reunification with [the children]." Brief of Appellant at 1. However, he does not make any actual argument regarding this issue in the remainder of his brief. To the extent Father intended to raise a due process challenge to the termination, we note that although Indiana Code section 31-34-21-5.5(b)(2) provides DCS "shall make reasonable efforts to preserve and reunify families . . . [and] make it possible for the child to return safely to the child's home as soon as possible[,]" the law concerning termination of parental rights does not require DCS to offer services to parents to correct their deficiencies in childcare. In re B.D.J., 728 N.E.2d 195, 201 (Ind. Ct. App. 2000). DCS routinely offers services to parents in aid of regaining custody of their children and a participation plan serves as a useful tool in assisting parents in meeting their obligations. Nonetheless, termination of parental rights may occur independent of services as long as the elements of Indiana Code section 31-35-2-4 are proven by clear and convincing evidence. Id. Thus, the provision of reunification services or lack thereof has no bearing on the termination decision.

[2] The children's mother passed away in 2008.

[3] The two girls, though twins and in the same grade, attended different schools.

her allegations during the interview, claiming, among other things, that Father "puts his privacy" on her and "makes her lick his weiner," that he "puts his butt on her, her brother . . ., and her sister[,]" and that he spits on his hand and rubs his "privacy part so that he could put it in her . . . ." State's Exhibit G. El. reported Father has his clothes off when he does this, that it hurts, and that she tells him no but he does not listen. El. also reported that Father does the same to Em. Whichever girl sleeps on the bottom bunk bed "is the one who gets it." Id. Em. was not forthcoming about any abuse during her interview, but she was scared and visibly shaking. DCS also went to Father's house, where they found S. with a dirty face and feces-stained underwear. Father denied any wrongdoing, as did B. The children were removed from Father's care that day and placed in foster care. The children were adjudicated children in need of services and placed with their maternal grandparents, in whose care they remained at the time of the termination hearing.[4]

Sexual assault exams were conducted on the children. El. related to the nurse the same allegations she had made to school and DCS personnel. Of note from her exam were bruises on her shins and redness or irritation to her labia minora. Em. was found to have an abnormal hymen that could be indicative of a well-healed tear. She did not relate any sexual molestation to medical personnel. S. had an enlarged anal opening and stretched tissue around his anus. Approximately one week after removal, El. and Em. were interviewed at the Family and Domestic Services Bureau ("FAB Center") but neither girl disclosed any sexual abuse at that time.

---

[4] Contrary to the requirements of Appellate Rule 50(A)(2)(a), Father has not included a copy of the Chronological Case Summary as part of his appendix.

The family was referred for psychosexual evaluations at Mid-America Psychological & Counseling Services, P.C. ("Mid-America"). Father arrived approximately ninety minutes early for his intake appointment in December 2011 and encountered the children. El. became "extremely upset and fearful," and Em. became "extremely anxious, agitated, and expressed a fear of being kidnapped." State's Exhibit D. As a result, on Mid-America psychologist Dr. Kalyani Gopal's recommendation, contact between Father and the children, even including supervised visitation or family therapy sessions, was suspended. The completed evaluations diagnosed both girls as victims of sexual abuse and with acute stress disorder; Em. was further diagnosed with depressive disorder. Intensive trauma-focused therapy was recommended for both girls. S. also attends weekly therapy sessions.

On March 11, 2013, DCS filed a petition to terminate Father's parental rights. Contact between Father and the children had not resumed, and the children continued in therapy but struggled with anger and fear of their father. At the fact-finding hearing, Dr. Gopal, two family case managers, and the family therapist all testified that it was in the best interests of the children for Father's parental rights to be terminated and for the children to be adopted by their grandparents. The trial court issued an order finding DCS had proved by clear and convincing evidence each statutory element for involuntary termination and granted DCS's petition for termination of Father's parental rights. Additional facts will be provided as necessary.

## Discussion and Decision

### I. Standard of Review

4

The Fourteenth Amendment to the United States Constitution protects the right of parents to establish a home and raise their children. In re J.S.O., 938 N.E.2d 271, 274 (Ind. Ct. App. 2010). The involuntary termination of parental rights is an extreme measure to be used only when all other reasonable efforts have failed. Id. The interests of the child trump the interest of the parent, though, when evaluating the circumstances surrounding termination of a parent-child relationship. In re J.H., 911 N.E.2d 69, 73 (Ind. Ct. App. 2009), trans. denied.

When we review the termination of parental rights, we give deference to the trial court's unique position to assess the evidence. Id. Therefore, we consider only the evidence and reasonable inferences that are most favorable to the judgment. In re G.Y., 904 N.E.2d 1257, 1260 (Ind. 2009). When we review findings of fact and conclusions of law involving a termination of parental rights, we apply a two-tiered standard of review: first, we determine whether the evidence supports the findings and second, whether the findings support the judgment. Id. We will not reweigh the evidence or judge witness credibility and will set aside the trial court's judgment only if it is clearly erroneous. Id.

The requirements for involuntary termination of the parent-child relationship are codified in Indiana Code section 3l-35-2-4(b)(2). The State must show:

> (A) that one (1) of the following is true:
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>> * * *
> (B) that one (1) of the following is true:
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>> * * *

5

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

The State must present clear and convincing evidence of each of those elements. Ind. Code § 31-37-14-2. The evidence need not show that continued custody by the parent is wholly inadequate for the child's survival. In re G.Y., 904 N.E.2d at 1261. Rather, it is enough for DCS to show by clear and convincing evidence that the child's emotional and physical development are threatened by the parent's custody. Id.

## II. Sufficient Proof to Support Involuntary Termination

Father concedes that the children have been removed from him since November of 2011 and therefore, the time requirement of Indiana Code section 31-35-2-4(b)(2)(A)(i) is met. See Brief of Appellant at 9. Father also concedes that DCS's plan to allow the maternal grandparents to adopt the children is a satisfactory plan for their care and treatment. See id. at 11. He argues, however, that DCS failed to prove by clear and convincing proof the remaining elements of the statute. The trial court found that DCS had proved both there is a reasonable probability that the conditions that resulted in the children's removal would not be remedied and there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the children. The trial court also found termination is in the best interests of the children.

Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and therefore DCS need only prove either that there is a reasonable probability that conditions resulting in removal will not be remedied or that continuing the relationship poses a threat to the children's well-being. In re D.D., 804 N.E.2d 258, 266 n.2 (Ind. Ct. App. 2004), trans. denied. The trial court here found both; because of the particular nature of the allegations

6

in this case, we focus on the trial court's finding that continuation of the parent-child relationship poses a threat to the children's well-being, but much of the evidence is equally supportive of the trial court's finding that removal conditions will not be remedied.

The trial court entered thorough findings of fact and conclusions thereon. The relevant facts found by the trial court and supported by the record include the following: examinations of the children following removal showed some physical evidence supporting the children's allegations of inappropriate sexual contact; the children were "very explicit" in their statements about what Father had done to them and what they had been exposed to; psychosexual evaluations of El. and Em. indicated that they suffered from "Acute Stress Disorder, sexual abuse, and post traumatic stress disorder"; the children were "highly terrified" of Father when they were first interviewed and "highly traumatized" when they accidentally encountered him after removal; Em. continues to self-harm and struggles with rage; S. has nightmares, urinates in inappropriate places, and smears his feces; and El. masturbates regularly. Appellant's Appendix at 1-2. Further, Father's psychological evaluation indicated he has "paranoid personality disorder and delusional disorder"; although Father had both positive and negative drug screens during the proceedings, he had a positive drug screen as recently as three months before the termination hearing; and Father is the subject of an open criminal investigation and "remains in denial of the abuse of his children." Id. at 2. Ultimately, the trial court concluded that the children's well-being

> does not support visitations or reunification. Reunification with [Father] could not be obtained due to [F]ather's denial of the children's abuse and the trauma the children still cannot overcome. The children are highly

7

fearful of [Father] and there are extreme safety concerns if the children were in [F]ather's care. Father is not a viable placement for the children.

Id.

Father does not contest any specific finding by the trial court, instead highlighting evidence he contends refutes the evidence supporting the trial court's findings. The very purpose of making findings of fact is for the trier of fact to state what it determined to be true after weighing all the testimony and evidence. See Parks v. Delaware Cnty. Dep't of Child Servs., 862 N.E.2d 1275, 1279 (Ind. Ct. App. 2007) (noting that "a finding of fact must indicate, not what someone said was true, but what is determined to be true, for that is the trier of fact's duty." (quotation omitted)); see also In re Adoption of T.J.F., 798 N.E.2d 867, 874 (Ind. Ct. App. 2003) ("A court . . . does not find something to be a fact by merely reciting that a witness testified to X, Y, or Z. Rather, the trier of fact must find that what the witness testified to is the fact." (emphasis added) (citation omitted)). That there may have been contradictory evidence does not require the trial court to have given it credit. For instance, Father notes that the trial court did not mention that he took a polygraph test which found he was being truthful regarding his denial of molesting the children. However, there was also testimony from Dr. Kalyani Gopal, a clinical psychologist whose agency provided services to Father and the children, that a person with Father's diagnoses of paranoid personality disorder and delusional disorder could easily pass a polygraph because he believes he did not do anything wrong. Father also notes that neither El. nor Em. disclosed being sexually abused at their first FAB interview and alleges that they did so only at a later interview after they had begun counseling and had been "asked over and over again about being molested." Brief of Appellant at 10.

8

However, this discounts in particular El.'s initial unprompted report at school and her consistent statements thereafter when first interviewed by DCS and at the hospital. To the extent Father contends the children were coached to make false allegations, the testimony belies that argument. Both the family case manager and the therapist treating the family emphatically denied the grandparents were coaching the children to say that molestation had occurred when in fact it had not. Moreover, Father's argument is essentially a request that we reweigh the evidence in his favor which we will not do. See In re G.Y., 904 N.E.2d at 1260.

As Dr. Gopal testified, she believes the children were molested and that they were molested by Father, but more importantly, the children believe they were molested by Father and they are afraid of him. Father not only denies he molested the children, but he appears to have no concern for whether they were molested at all. Reunification therefore presents a safety concern from both a physical and an emotional standpoint. We do not imply that Father should admit to something he did not do simply to expedite the return of his children, but because there is no evidence in this case of coaching or coercion in the children's allegations and because the children believe Father molested them, they cannot feel safe and secure in his custody especially if he has taken no steps to address the fundamental issue at the root of their removal. The trial court's findings sufficiently support its conclusion that DCS proved by clear and convincing evidence that the continuation of the parent-child relationship poses a threat to the well-being of the children.

As for the best interests of the children, Father's primary argument is that termination will cause the children pain and suffering at the loss of opportunity to have a

9

relationship with a father who loves them and with any future siblings, encroaching "on the fundamental rights of families." Brief of Appellant at 12. In determining the best interests of the children, the trial court should consider the totality of the circumstances and subordinate the interests of the parent to those of the children. In re A.P., 981 N.E.2d 75, 82 (Ind. Ct. App. 2012). The purpose of terminating parental rights is not to punish parents but to protect children. R.W., Sr. v. Marion Cnty. Dep't of Child Servs., 892 N.E.2d 239, 249 (Ind. Ct. App. 2008). The evidence in this case shows that the children were molested by Father and require intensive therapy to deal with the trauma. Every professional who has had contact with the children testified that it is in their best interests to have no further contact with Father. There is no evidence in the record to suggest the children would benefit from returning to the care of a man they believe abused them. This evidence is sufficient to support the trial court's determination that termination of Father's parental rights is in the children's best interests.

## Conclusion

Our review of the record reveals DCS proved by clear and convincing evidence all the statutory elements required for termination of Father's parental rights to the children. The trial court's judgment is therefore affirmed.

Affirmed.

RILEY, J., and BRADFORD, J., concur.