## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 20 2020, 10:20 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Harold E. Amstutz
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Involuntary Termination of the Parent-Child Relationship of:

D.P., Jr. (Minor Child),

and

D.P., Sr. (Father),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

March 20, 2020

Court of Appeals Case No.
19A-JT-2554

Appeal from the Tippecanoe
Superior Court

The Honorable Faith Graham,
Judge

Trial Court Cause No.
79D03-1902-JT-34

**Altice, Judge.**

## Case Summary

[1]     D.P., Sr. (Father) appeals from the trial court's order involuntarily terminating his parental rights to his son, D.P., Jr. (Child).[1] Father challenges the sufficiency of the evidence supporting the termination order.

[2]     We affirm.

## Facts & Procedural History

[3]     Mother and Father (collectively, Parents) have been in a relationship since about 2016, and Mother became pregnant with Child in 2017. During the pregnancy, they moved from Wisconsin to Indiana with two of Mother's children, A.C. (born in April 2012) and J.S. (born in April 2016).[2] Father acted as a father figure to A.C. and J.S. The Indiana Department of Child Services (DCS) became involved with the family in November 2017 due to allegations of physical abuse of A.C. as well as neglect due to lack of food while in Parents' care. The DCS assessment worker closed the case after a couple weeks.

[4]     Thereafter, Child was born on January 7, 2018, at over thirty-eight weeks gestation. He weighed 6 pounds 7.4 ounces at birth. Medical records at the

---

[1] The parental rights of Child's mother A.S. (Mother) were also terminated with respect to Child and two of his half-siblings. Mother, however, does not participate in this appeal.

[2] Mother has birthed four other children, none of whom are in her custody. Her parental rights have been terminated previously with respect to some or all of these children.

time indicated "concerns with suboptimal parenting" and noted that J.S. was "in too-small carseat without sufficient clothing for cold weather" and that staff had witnessed A.C. "being struck in the arm" by Mother or Father at a previous appointment. *Exhibits Vol. 2* at 111. Additionally, nursing notes taken the day following the birth indicated that "neither parent is caring for baby", nurse is having to "constantly remind them to feed baby", and nurse is finding the baby "crying hungry and in saturated wet clothes." *Id*. at 112. The hospital reported these concerns to DCS, which then interviewed Parents and completed a home visit. Child was released from the hospital to Parents' care on January 9, 2018, weighing 6 pounds 1.9 ounces.[3]

[5] On February 14, 2018, Child was seen at Riggs Clinic for a well child check. The doctor instructed Parents to take Child to the emergency room right away, but they proceeded to wait about five hours before doing so. DCS had already been notified prior to their arrival at the hospital that evening. The trial court's findings detail Child's presentation on arrival:

> [Child] was pale, and his heart rate was low registering at 80/90 when it should have been 140/160. Medical records indicate [Child] appeared "extremely thin and malnourished". [Child's] skin was wrinkled "due to a lack of adequate fat stores" and "appeared dry and flaking, which is another sign of malnutrition". [Child] acted as though he had been starved. [Child] remained curled in a ball most of the time and did not wake or cry, often appearing very lethargic. [Child] was

---

[3] The trial court's findings incorrectly indicate that Child was released on January 7, 2018, which was the day of his birth, weighing 6 pounds 19 ounces. The medical records clearly provide otherwise.

diagnosed as Failure to Thrive due to inadequate calories and admitted to the hospital weighing 6 lbs. 1.2 oz.

*Appellant's Appendix Vol. 2* at 12.

[6]     Despite Child's critical condition, Parents became extremely upset about Child's admission to the hospital and wanted to take him home. They believed there was nothing wrong with Child and repeatedly urged that his low weight was due to his "preemie status," although Child was not born premature. *Exhibits Vol. 2* at 146. Parents told DCS assessment worker Laura Somerville that Child was "chubby" and "had been eating very well." *Transcript* at 33.

[7]     On February 19, 2018, the treating physician spoke with Parents at length regarding the situation. Parents indicated that they were not worried about Child's condition when they went to the well child check five days earlier. Following the conversation, the physician noted in part:

> [Parents] cannot seem to wake up every 2 hours to feed [Child] during the night – even though we have stressed that it is imperative that he eat often to make up for his huge deficit. I feel they have no insight or higher understanding of why he has had poor growth and they have not demonstrated that they ALONE can take care of his needs.

*Exhibits Vol. 2* at 157 (emphasis in original). The physician voiced strong concerns for Child's safety if returned to Parents' care. While hospitalized, Child's weight steadily increased with regular feedings.

[8] On the day of Child's discharge from the hospital, February 20, 2018, he was taken into emergency custody by DCS. Somerville, with law enforcement present, informed Parents of this decision. Mother, in turn, became angry and threatened that she was going to take A.C. and J.S. and leave the state. Somerville advised Parents that they could not take the children out of the state, but Parents stormed out taking all of Child's belongings with them. DCS's original plan was to allow A.C. and J.S. to remain in the home with services, but as a result of Parents' actions, Somerville decided to remove A.C. and J.S. as well.

[9] At the time of the removal of the older children later that afternoon, A.C. had bruising on one of her arms, J.S. had a large area of diaper rash, the children were without beds and had been sleeping on the floor with blankets, both had head lice, and A.C. reported not having been fed that day. A.C. also reported, and Mother later confirmed, that Parents had locked her in her room when she was bad and that she had destroyed the bottom of her door trying to get out.

[10] On February 22, 2018, DCS filed a petition alleging that Child, A.C., and J.S. were children in need of services (CHINS). The trial court ordered the continued detention of the children in foster care. Following a factfinding hearing, the trial court adjudicated all three children as CHINS in an order dated May 31, 2018 (the CHINS Order). In addition to outlining the details regarding Child's hospitalization and diagnosis, the CHINS Order set out the following facts:

> Since the [Child]'s placement outside the care of the parents his weight has doubled and he currently weighs approximately 14 LBS. Upon removal, [J.S.] and [A.C.] appeared healthy aside from diaper rash. Parents reported [J.S.] was on the autism spectrum however the Nurse Practitioner and the daycare provider have not observed signs of autism….
>
> Mother and [Father] are currently in a relationship and reside together. Neither parent is employed. Parents report they obtained formula for the infant from the maintenance man and the landlord. Parents have a dog in the home that is displaying aggression and parents report no plan to have the animal removed.

*Id.* at 131. In the CHINS Order, the court also proceeded to disposition and adopted the statements, findings, and plan as set out in the predispositional report. Among other things, Parents were ordered to keep all appointments with service providers, "maintain suitable, safe and stable housing with adequate bedding, functional utilities, adequate supplies of food and food preparation facilities," secure and maintain a stable source of income "adequate to support all household members," and attend all scheduled visitations. *Id.* at 165. Additionally, Father was ordered to participate in a parenting assessment, homebased case management, and a psychological evaluation, as well as follow all resulting recommendations.

[11] DCS family case manager (FCM) Lisa Vos took over the family's case in March 2018. DCS held family and team meetings and referred Parents for supervised visits, parenting assessments and education, psychological

evaluations, mental health assessments, substance abuse assessments, individual therapy, and homebased case management.

[12] Father participated in a mental health assessment in April 2018, which resulted in a diagnosis of mild neurocognitive disorder due to traumatic brain injury from being hit by a car in 2000. The assessment found that Father has borderline intellectual functioning, poor insight, and poor memory. Based on the assessment, Father was referred for individual therapy and services related to disability filing and insurance. However, he was subsequently discharged from individual therapy for lack of attendance and failure to comply with recommendations. Father was also referred for a psychological evaluation, but he never scheduled that evaluation.

[13] Mother and Father both struggle with unemployment and have a history of not holding jobs for more than a few days. Father occasionally donates plasma for income. His homebased case manager attempted to help him file for social security disability benefits, but he refused to provide documentation or attend necessary doctor appointments. FCM Vos explained that Father had been discharged from several providers of homebased counseling due to noncompliance and had shown "a lot of reluctancy to work with [them] as far as getting put on any type of assistance". *Transcript* at 86. Parents were often uncooperative and even dishonest with service providers.

[14] Throughout the CHINS case, Parents were referred to services with multiple agencies (including seven different agencies for supervised visits and six for case

management services) and repeatedly discharged for failure to follow policies and for lack of attendance. Parents were found in contempt on November 19, 2018 for failing to attend scheduled homebased case management sessions and supervised parenting time, as well as failing to obtain Medicaid/insurance and necessary medical exams. Even after being found in contempt, Parents were discharged from case management services again in December. Further, their supervised visits with A.C. and J.S. were eventually suspended due to lack of attendance that was causing the children distress, and their visits with Child were reduced to once per month.

[15] Parents were evicted from their home in November 2018 and began living in a tent with their dog. When they attended a free Christmas dinner, they met Cherry Buckley, the CEO of Seeds of Hope, a community ministry program that offers housing and wrap-around services. Seeds of Hope provided them with transitional housing in a rooming house, but they left after a few days because they did not like it and went back to living in their tent. Their tent flooded a couple weeks later, and Parents moved into a motel before contacting Seeds of Hope again. The Seeds of Hope program was unaware of the CHINS case at the time.

[16] In late January 2019, Parents moved into an apartment through Seeds of Hope and were required to pay rent of $500 per month plus utilities. On four occasions, Father was permitted to do maintenance work to reduce the rent, but he failed to meet work expectations each time and once did not show up. At some point Parents obtained a second dog, and they have sought assistance

from Seeds of Hope to feed the dogs, who are "quite aggressive." *Id*. at 133. Parents have been reluctant to use food pantries due to "the quality of food", which has required Seeds of Hope to gather food for them on a couple occasions. *Id*. at 135.

[17] Nancy Bundy with Seeds of Hope tried to work with Parents on budgeting so that they could afford housing and utilities. This proved "extremely challenging" because Parents were vague about their income, dishonest about employment, and "the numbers just didn't add up." *Id*. at 136.

[18] Following the February 25, 2019 permanency hearing in the CHINS case, the trial court approved initiation of termination proceedings. DCS recommended this change in the permanency plan because, among other things, Parents continued to struggle with taking responsibility for their actions, had been repeatedly discharged from services due to lack of engagement, were on a step-down visitation schedule due to missed visits, and were dishonest with service providers. In her report, the CASA urged the court to allow the initiation of termination proceedings, noting:

> [DCS] has worked diligently to provide services to [Parents], but they have refused to be cooperative or participate in services in the last 12 months. There have been numerous family team meetings scheduled to discuss issues and parents either do not show up or fail to comply. They are currently working with the 7th agency. The previous ones have resulted in discharge due to noncompliance.

The parents have been and continue to intentionally make misleading comments to all parties, including facilitators, potential employers, dentist, landlords and the court.

\*\*\*

[Parents] feel no responsibility for their situation. They are the victims, nothing is their fault. CASA finds this lack of accepting responsibility astonishing and telling of their role in this problem.

All of the children have bonded with their foster parents and they are a family. The children refer to them as Mom and Dad and CASA has witnessed a loving atmosphere.

CASA feels it is in the best interest of the children to terminate the parent's rights [sic] and allow the foster parents [to] proceed with adoption.

*Exhibits Vol. 1* at 232-33.

[19]  On March 7, 2019, DCS filed a petition for the involuntary termination of the parent-child relationship between Parents and Child, and the petition was amended a week later.[4] The factfinding hearing in the termination case was held on June 11, 2019, at which the above facts were presented into evidence through various witnesses and exhibits. Additionally, Buckley from Seeds of Hope testified that she had only learned of the DCS case and the children a few

---

[4] Termination petitions were also filed with respect to A.C. and J.S. As Father is not their father, we do not address the termination proceedings related to A.C. and J.S. and their respective fathers.

months before the hearing. In Buckley's opinion, Parents are not ready to parent, can "hardly support themselves," and "[will] be lucky if they can stay in housing, the two of 'em." *Transcript* at 129, 130. She expressed her concerns directly to Parents a couple months before the hearing, but Buckley testified, "I don't think they heard me at all." *Id.* While she understood Parents' longing to raise their children, based on what she had seen of Parents during their nearly six months with Seeds of Hope, Buckley indicated that she "could not recommend that in good heart, heart for the safety of their children long-term." *Id.* at 130.

[20] FCM Vos testified regarding Parents' lack of progress, frequent discharges from services, reluctance to work with homebased case managers and to provide needed information for Father to obtain disability benefits, and overall failure to take any responsibility. According to FCM Vos, "it kinda just feels like we're right where we started." *Id.* at 72. She recommended termination and adoption by the current foster family[5] as in Child's best interests and opined that continuation of the parent-child relationship would harm Child.

[21] Similarly, the CASA supported termination of parental rights and adoption as in the best interests of Child, as well as A.C. and J.S. She noted Parents' "insignificant progress over the last seventeen months", their failure to comply with "basically any of the requests from DCS", their instability and inability to

---

[5] Since May 2018, Child has been in the same foster home as A.C. and J.S. The children are all bonded with their foster family. The foster parents wish to adopt the sibling group.

keep appointments, and their penchant to always blame someone else for their situation. *Id*. at 112.

[22] Mother testified and acknowledged that she and Father have had financial struggles. She claimed, however, that they had "got[ten] back on track" and explained, "[Father] does plasma and he just told me today that he wants to go find him a job and me stay home and be the home, mom with the kids." *Id*. at 145. Mother indicated that Father was currently behind on his half of the rent and that if he did not pay, he could face eviction. Father testified that his most recent job lasted two or three days and the one before that did not last long because he "threatened to run a guy over with [a] forklift." *Id*. at 168.

[23] On October 9, 2019, the trial court issued a detailed order granting the involuntary termination of Father's (and Mother's) parental rights. Father now appeals.

## Discussion & Decision

[24] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. In light of the applicable clear and convincing

evidence standard, we review to determine whether the evidence clearly and convincingly supports the findings and whether the findings clearly and convincingly support the judgment. *In re R.S.*, 56 N.E.3d at 628.

[25] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id*.

[26] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things, that one of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B); Ind. Code § 31-37-14-2. DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D); I.C. § 31-37-14-2.

[27] On appeal, Father asserts that there is insufficient clear and convincing evidence that the conditions resulting in Child's removal would not be remedied, that the continuation of the parent-child relationship poses a threat to the well-being of Child, and that termination is in the best interests of Child. We will address each in turn as needed.

[28] DSC presented ample evidence to establish by clear and convincing evidence that there is a reasonable probability that the conditions resulting in Child's removal or continued placement outside the home will not be remedied by Father.[6] In making this determination, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial

---

[6] The trial court determined that DCS had proven both subsections (b)(2)(B)(i) and (b)(2)(B)(ii). Because DCS was required to establish only one of these by clear and convincing evidence, we focus our review on subsection (b)(2)(B)(i).

probability of future neglect or deprivation of the child. *Id*. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *In re L.S.*, 717 N.E.2d at 210.

[29] Father's primary argument in this regard is that his parental rights may not be terminated solely based on "his cognitive disabilities and intellectual challenges that resulted from his traumatic brain injury." *Appellant's Brief* at 17. "As our courts have long held: "Mental [disability] of the parents, standing alone, is not a proper ground for terminating parental rights." *In re V.A.*, 51 N.E.3d 1140, 1147 (Ind. 2016) (quoting *Egly v. Blackford Cty. Dep't of Child Servs.*, 592 N.E.2d 1232, 1234 (Ind. 1992)).

[30] The trial court's findings, here, do not indicate that termination was based solely, or even substantially, on Father's cognitive disability. Rather, the evidence and findings reveal that time and again DCS provided Father with services to address his difficulties with scheduling, parenting, housing, and finances, including unsuccessful attempts to help him obtain disability benefits.[7] Father, along with Mother, failed to comply with services or regularly visit Child, was unsuccessfully discharged by many providers, was dishonest with

---

[7] Father suggests that DCS failed to provide special services or tailor their normal services to Father's disabilities, but he does not explain what additional services should have been provided him. The record, however, reflects that a number of services were referred and rereferred throughout the case, and Father consistently rebuffed efforts by said providers.

those trying to assist him, and failed to take any responsibility for Child's dire health condition that resulted from malnourishment while in his care. At the time of the termination hearing, Father had not secured employment or disability income and his housing was not stable, as he was behind on rent and not reliable in working off his rent when given the opportunity. Buckley, who had helped Parents with housing and services through Seeds of Hope for nearly six months leading up to the termination hearing, testified that Parents can "hardly support themselves," and "[will] be lucky if they can stay in housing". *Transcript* at 129, 130.

[31] We have no doubt that Father loves Child, and we recognize that Father has no substance abuse issues or criminal history. But the reality is that at the time of the termination hearing, after sixteen months of services being offered him, Father was in no better position to safely parent and provide for Child than he was at the time of removal. *Cf. R.W., Sr., v. Marion Cty. Dep't of Child. Servs.*, 892 N.E.2d 239, 248-49 (Ind. Ct. App. 2008) (affirming termination where Mother refused to "take readily available steps to bridge the communication gap caused [by her disability]" and parents were not able to appropriately supervise the children, had failed to complete homebased services, had not achieved the dispositional goal of securing and maintaining safe and stable housing, and had made no significant overall improvement in the conditions leading to removal); *R.G. v. Marion Cty. Office, Dep't of Family & Children*, 647 N.E.2d 326, 330 (Ind. Ct. App. 1995) (considering parents' mental disabilities as a factor in affirming the termination of parental rights and concluding that termination was

appropriate because "Mother and Father ha[d] been both unable and unwilling to develop the skills necessary to fulfill their legal obligations as a parent"), *trans. denied*. Contrary to Father's assertions on appeal, it was not too early in the process to terminate his parental rights and there is no indication that "extending the CHINS case a few months" would have procured a different result for him. *Appellant's Brief* at 20. In light of the facts presented at the termination hearing, we conclude that sufficient evidence supports the trial court's determination that the conditions that led to Child's removal and continued placement outside Father's home will not be remedied.

[32] Turning to the best interest factor, Father asserts that DSC failed to prove with "individualized proof that [he] is unable to provide permanency for [Child]" and is, therefore, unfit. *Id.* at 24. In making this best-interests determination, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). The court must subordinate the interest of the parent to those of the child and need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is

sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[33] Father seems to suggest that the trial court's best interest determination was based solely on the fact that there is a better place for Child to live. On the contrary, the evidence established that while in Father's care, Child's life was put at serious risk as a result of malnourishment. Father and Mother were not cognizant of Child's dire condition at the time and have failed to accept responsibility since. Further, as discussed above, they have made little effort to prepare themselves to be able to safely parent Child and provide for his needs. Both the CASA and FCM Vos recommended termination was in Child's best interests. Specifically, the CASA noted Father's "insignificant progress over the last seventeen months" and failure to comply with "basically any of the requests from DCS". *Transcript* at 112. Given the lack of progress, the likelihood of conditions not being remedied by Father, and the recommendations of the CASA and FCM Vos, the trial court properly determined that termination of Father's parental rights is in the best interests of Child.

[34] Judgment affirmed.

Robb, J. and Bradford, C.J., concur.